UNITED STATES of America,
Plaintiff,

v.

The PHILLIPSBURG NATIONAL BANK
AND TRUST COMPANY and the Second National Bank of Phillipsburg, Defendants,

and

William B. Camp, Comptroller of the
Currency, Intervenor.

Civ. No. 56–68.

United States District Court
D. New Jersey.

Oct. 14, 1969.

Probable Jurisdiction Noted
Feb. 27, 1970.
See 90 S.Ct. 945.

**646**

Robert C. Weinbaum, Detroit, Mich., and Eugene T. Austin, U. S. Dept. of Justice, Washington, D. C., for the United States.

Meyner & Wiley, by Robert B. Meyner, and Thomas D. Hogan, Carpenter, Bennett & Morrissey, by Sylvester C. Smith, Jr., and Michael S. Waters, Newark, N. J., for defendants. Phillip L. Roache, Jr., Office of Comptroller of the Currency, Washington, D. C., for intervenor.

SHAW, District Judge.

This action is brought by the United States pursuant to Section 15 of the Clayton Act (15 U.S.C. § 25) to restrain a proposed merger of the defendant banks which, if consummated, is alleged to be a violation of Section 7 of the Act (15 U.S.C. § 18). Phillipsburg National Bank and Trust Company (PNB) and The Second National Bank of Phillipsburg (SNB) have entered into an agreement to merge. The merger has been approved by the Comptroller of the Currency who, by leave of Court, has intervened in this action in support of the proposed merger.

The principal office of each bank is located in the City of Phillipsburg, New Jersey, and each is engaged in interstate commerce. PNB operates two branch offices, one in the Borough of Alpha, New Jersey, and the other in Lopatcong, New Jersey. SNB operates one branch office in the City of Phillipsburg.

Section 7 of the Clayton Act is applicable to bank mergers. United States v. Philadelphia National Bank, 374 U.S. 321, 335–349, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The question presented under Section 7 of the Clayton Act is whether the effect of the merger "may be substantially to lessen competition" within the product market where the defendant banks operate. If the answer is in the affirmative, the merger must be restrained unless it is shown "that the anticompetitive effects * * * are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C. § 1828(c) (5) (B).

■ The burden of proof rests upon plaintiff to establish by a preponderance of the evidence the likelihood that competition may be substantially lessened in the relevant product market if the merger is permitted. If the probability of such effect in the relevant product market is established, the burden of proof then rests upon the defendants and the intervenor to establish by a preponderance of evidence that any anticompetitive effects are clearly outweighed in the public interest by the service the resultant bank can offer in serving the convenience and needs of the community. Evaluation of effect upon competition that may result from the merger requires examination of the line of commerce involved and the appropriate geographic product market in which the banks are competitive.

### LINE OF COMMERCE

Commercial banking has been identified as a line of commerce in the banking industry. Philadelphia National Bank, supra. See also United States v. Third National Bank of Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); United States v. First National Bank and Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964). The Supreme Court in *Philadelphia* stated:

We have no difficulty in determining the "line of commerce" * * * in which to appraise the probable com-

petitive effects of appellees' proposed merger. We agree with the District Court that the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking," * * * composes a distinct line of commerce. Id. at 356 of 374 U.S., at 1737 of 83 S.Ct.

While the term "commercial banking" may be used as a general description of a line of commerce in bank merger cases, a detailed analysis of all of the competitive banking services offered to the public by the merging banks is necessary in each case. Areas of substantial and effective competition in the market in which the merging banks operate are not necessarily the same in each case. As the Supreme Court noted in *Philadelphia*, supra, "Some commercial banking products or services are so distinctive that they are entirely free of effective competition from products or services of other financial institutions; the checking account is in this category." Id. at 356, 83 S.Ct. at 1737. To the extent that a bank offers substantial banking services in effective competition with other banks and other financial institutions, the effect of a merger upon such competition, regardless of the source, must be considered. It is the line of commerce consisting of products and services offered which must be examined.

This requires a comparison of the products and services offered by competing banks and other financial institutions operating in the market so that the areas of distinct and effective competition may be delineated. Where, for instance, the competition is not substantial or effective, that circumstance is a factor to be weighed in the evaluation of probable lessening of competition. But, on the other hand, where a bank is ren-

dering a substantial banking service in effective competition with competing banks and other financial institutions, the effect of a lessening of present or imminently potential competition cannot be ignored in giving effect to Section 7 of the Clayton Act. In this case it seems from the record before the Court that in many of the banking services offered by the defendant banks there is very virulent and wide-spread competition from other banks and other financial institutions. The merger would have no substantial anticompetitive effect upon such services. The most significant of these services may be classified as time and savings deposits, conventional real estate loans, and financing of automobiles, appliances and business equipment. The demand deposit or checking account is a distinct commercial banking service free from competition except in the banking industry. In a lesser degree the same is true of short- and long-term commercial and industrial loans. Trust services offered are so insignificant that defendant banks cannot be presently considered as competitive in that field.

Comparatively speaking PNB and SNB rank in terms of assets and deposits among the small banks in the nation. PNB has total assets of $23,861,000 and SNB has assets of $17,255,000. The total assets of the resultant bank after merger would be $41,116,000. The total deposits in the merged banks would be $25,345,000. The lending limit on a single loan of PNB is $120,326. The lending limit of SNB on a single loan is $131,468. The lending limit of the resultant bank after merger could be expected to approach $250,000.[1]

William Paul Smith, a senior economist in the Office of The Comptroller of the Currency, after examining exhibits in evidence stated, "They definite-

1. The figures on assets, deposits and lending limits have been furnished as of the end of 1967. Lending limits have been computed on the basis of 10% of capital and surplus, undivided profits and reserves as approved by the Comptroller. The banks, however, have fixed lending limits on the basis of 10% of capital and surplus which, as to PNB, would be approximately $90,000 at the end of the year 1967 and $80,000 for SNB. The banks have employed the method of computing lending limits on the basis of 10% of capital and surplus.

ly do show that the banks involved here are in absolute terms small. They show that these banks do relatively little of certain types of business, particularly industrial and commercial lending." There is a preponderance of evidence that supports this conclusion. In terms of function the defendant banks are more comparable to savings institutions than to large commercial banks.

Nevins Dennis Baxter, an eminently qualified economist, stated:

> Well, they are fairly small commercial banks which are located in Phillipsburg, and do a business in which they compete with a large number of financial institutions. They are largely concerned with the borrowing or receiving of and lending money, and the activities of these banks really make them much more, in my opinion, like savings institutions than like so many of the larger commercial banks.

> I would like to refer to the defendants' Exhibit No. 4 to indicate the ratios of these banks, the factors that these banks concentrate on are quite different from all the banks in the United States. For example, for Phillipsburg National Bank under 10 per cent of the assets was in commercial and industrial loans, and under 8 per cent for the Second National Bank, as compared with 19.6 per cent for all banks in the nation.

> On the other hand, they emphasize real estate loans, mortgages, much more heavily than do average banks in the nation. 33 per cent for Phillipsburg National Bank, 44 per cent for Second National Bank and only 13 per cent in the nation, and on the deposit side the emphasis is much more heavily on time and saving deposits than it is on demand deposits. Both banks are up at 56 per cent as compared with only 41 per cent for banks in the nation as a whole. That is Table D-4 that I was referring to.

Professor Franklin Edwards, called as an expert by the government and testifying as a qualified economist, emphasized the demand deposit (checking account) and commercial and industrial lending, both short- and long-term, as unique features of commercial banking service. He placed particular emphasis upon loans to business men, particularly "to very small or just small business men, say a business man of under $200,000 or $250,000 of assets." Describing the type of business loans commercial banks made to the small business man, he stated:

> Well, they probably make both short and long-term loans. The short-term loans would be more in the area of working capital, loans for inventory purposes, we'll say, and the long-term loans might be in modernization of plant, expansion, term loans, these types of things.

Among the features that may be characterized as unique in the services rendered by a commercial bank are the acceptance of demand deposits for checking accounts, and the short- and long-term commercial and industrial loans for working capital, equipment and inventory. Though the defendant banks offer these commercial banking services, an analysis of deposits and loans indicate that they function more substantially like savings institutions. Upon comparison with demand deposits, it appears that the percentage of time and savings deposits is high. The capacity of a commercial bank to generate credit to meet the business needs of the community varies according to its demand deposits. It seems that a high percentage of demand deposits and a high percentage of commercial and industrial loans go hand in hand. The higher the volume of demand deposits, the greater is the potential for expansion of credit in the form of commercial and industrial loans. Accordingly, the quantity of funds that can be pumped back to meet the *current* credit needs of the business community is dependent upon the volume of demand deposits which a bank holds. Time and savings deposits as in the case of savings banks are employed primarily for mortgage and other long-term loans.

The same is true with respect to savings and loan associations in the field of mortgage loans.

The activity of the defendant banks in the field of services unique to commercial banking is very limited. This may be illustrated by comparison of deposits and loans with those of Girard Trust Company, a large commercial bank in Philadelphia:

Percentage of Demand Deposits of Total Deposits

| | |
|---|---|
| Girard | 58.8% |
| PNB | 29.3% |
| SNB | 22.8% (corrected 28%**) |

** G–40 erroneously used IPC demand deposits $3,648,000 rather than total demand deposits $4,550,000. Hence the percentage should be slightly higher, approximately 28%.

Percentage of C&I Loans of Total Loans

| | |
|---|---|
| Girard | 72.6% |
| PNB | 16.2% |
| SNB | 12.3% |

Percentage of Time and Savings Deposits of Total Deposits

| | |
|---|---|
| Girard | 41%* |
| PNB | 71% |
| SNB | 72% |

* The total deposits of Girard as listed in D–20 omitted a number and is incorrect. The correct figure should read $1,289,941,000.

———◆———

Considerable and persuasive evidence has been offered by the defendant banks and the intervenor to establish virulent and wide-spread competition for the savings dollar, conventional mortgage loans, individual and dealer automobile financing, dealer and individual financing of appliances, equipment and commercial inventory. This competition comes in part from the banks located not only in close proximity to Phillipsburg but also from many others located a considerable distance from Phillipsburg. It also comes in substantial part from savings and loan associations, pension funds, mutual funds, government bonds, insurance companies and finance companies. Banks compete with savings and loan associations, pension funds, mutual funds, insurance companies and government bonds for the savings dollar. Hence, the bank savings account and certificate of deposit is not a unique bank service free from effective competition. Savings and loan associations and insurance companies compete with the banks for real estate mortgage loans. Finance companies compete for dealer and individual automobile financing and for financing of appliances and equipment.

The area in and from which the defendant banks encounter highly competitive and effective competition from a host of competitors for the products and services above mentioned is broad, extending radially at least 25 miles from Phillipsburg in some instances and farther in others. Distant entry into the market for substantial commercial and industrial loans ($100,000 and over), floor plan financing of automobile dealers, financing large stocks of commercial inventory and industrial and commercial equipment and appliances seems to be attributable to a lack of capacity of local banks in the Phillipsburg area to extend the substantial credit required. The same is true in a lesser degree with respect to mortgage loans in excess of $80,000, primarily sought for industrial de-

velopment. It seems, however, that the field of home owner mortgage loans can be adequately serviced by the banks in Phillipsburg and those located within relatively short distances from Phillipsburg if participation of savings and loan associations with banks in this market is considered. Competition here will not be affected adversely by the merger.

As previously indicated, an efficient trust service has not been developed by the defendant banks or by any others in the immediate area with minor exceptions such as the branch bank of Girard Trust Company of Philadelphia located in Riegelsville, Pennsylvania. While it is true that the defendant banks offer some trust service together with other banks such as The Easton Bank and Trust Company in Easton, Pennsylvania, and Nazareth National Bank and Trust Company, Nazareth, Pennsylvania, and a few others, the capacity and expertise to operate the kind of a trust department which could service substantial trust accounts is so limited that it is inadequate to serve the needs of the community.

If the geographic area of competition were drawn to include competition with all of the banking services which the defendant banks offer, it would be so unduly broad as to be meaningless in any evaluation of impact upon competition by the merger. It seems to the Court that the better approach in defining the line of commerce is to single out those products and services which are not only unique to commercial banking, but also those where the banks in the relevant geographic market are directly and effectively competitive. Parenthetically, it may be noted that while there is widespread competition to entice the savings dollar by banks and many other institutions, it is arguable, however, that the convenience factor dictates that a relatively limited area should be considered for this particular service and that it should be included in the relevant line of commerce. The Court concludes that the appropriate line of commerce in this particular case should consist of those products and services labeled as checking accounts, savings accounts, certificates of deposit, personal loans, consumer installment loans, and commercial and industrial loans. Home mortgage loans have not been included because the record before the Court indicates that there are so many sources of funds for this type of loan that the merger could have no appreciable effect upon any potential mortgagor or group.

The approach here has been to select only those products and services as the line of commerce in which the impact of the merger upon competition, if any, is likely to be felt. It is definitely not likely to be felt in trust department service, small real estate mortgage loans, automobile dealer financing, large scale commercial inventory financing, and in commercial and industrial loans in excess of $100,000. The need for more bank participation to afford effective competition in these products and services will be considered in later discussion of the needs and convenience of the community, particularly with reference to probable pro-competitive effects of the merger.

The approach adopted may not be orthodox in the light of previous bank merger decisions. But this is not the usual bank merger case which has come to the attention of the courts. Each of the defendant banks is a very small bank and the resultant bank will still be a small bank. Their competitors in *many* of the services and products offered are so numerous and effective in competition that the merger creating a larger but still small bank could not have any possible detrimental effect upon the present competition, much less the imminent potential ever increasing competition. Within the general line of commerce there are different clusters of products. Some encounter wide-spread competition from many sources. Others encounter substantial competition only from competing banks. So, while the term "commercial banking" may be used to designate the general line of commerce embracing all bank services, attention must be given in analysis of competition to

different groupings within the line of commerce separating those products and services where absence of competition may be significant from those in which competition from many sources is so widespread that no question of significant diminution of competition by the merger could be raised.

Accordingly, it seems that attention must be focused upon a small market both in terms of area and in products and services of the merged bank in which it could make its presence in the market felt. This is not intended to suggest that a stronger merged bank, in terms of assets, deposits and a substantial lending limit, could not, by exercise of its increased financial strength, operate with greater economic power than smaller banks and thereby capture the customers for products and services distinct from those above mentioned as constituting the competitive line of commerce in this case. For example, when a business man procures a loan from a local bank which another bank cannot offer, the likelihood is that he will open his checking account with the lending bank and no doubt avail himself of the other services offered. But this is a healthy kind of competition where the emphasis should rest upon service of the needs of the community rather than upon anticompetitive effect detrimental to a community. Of course, carried to the extreme, where, by exercise of its economic power in the market, the bank could dominate the customer by fulfilling certain needs of which others were not capable with substantial diminution of customer choice, there would be adverse anticompetitive effect. It is not conceivable, however, that the merged bank would have any such economic power or could achieve it in the foreseeable future. Indeed, there is a preponderance of evidence in the record here in support of the argument that increased capacity to serve a rapidly developing community with better bank credit is essential to continued growth and satisfaction of bank service needs within the community rather than outside. This subject will be dealt with in greater detail in discussion of the credit needs of the community.

## THE RELEVANT GEOGRAPHIC MARKET

A market consists of a group of sellers handling the same or comparable products and a group of buyers seeking those products. Purchaser convenience of access to the place of business of the seller is of paramount importance in fixing the geographic boundaries of the market. "In banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance." *Philadelphia,* supra, Id. at 358, 83 S.Ct. at 1738. It is difficult to draw precise boundaries. If the area is drawn too broadly, customers' convenience is not given due consideration and the expansive market unduly diminishes probable anticompetitive considerations. If geographic lines are drawn too narrowly, undue emphasis is placed upon probable anticompetitive effect. There must be "some fair intermediate delineation which avoids the indefensible extremes of drawing the market either so expansively as to make the effect of the merger upon competition seem insignificant, because only the very largest bank customers are taken into account in defining the market, or so narrowly as to place appellees in different markets, because only the smallest customers are considered." *Philadelphia,* supra, Id. at 361, 83 S.Ct. at 1740.

The government urges that the appropriate geographic market is the City of Phillipsburg and its environs consisting of the city and a few small municipalities adjacent to the boundaries of the city: Lopatcong Township, Pohatcong Township, Greenwich Township, Alpha Borough. This proposed market is very small. Alternately plaintiff suggests a larger area designated Phillipsburg-Easton and environs consisting of Phillipsburg and environs, the City of Eas-

ton, Forks Township, Williams Township, Palmer Township, Wilson Borough, West Easton Borough, Glendon Borough, Stockertown Borough, Tatamy Borough. The most distant point from the City of Phillipsburg in this geographic area is approximately six miles.

The areas beyond the cities of Phillipsburg and Easton are primarily rural with excellent highways for rapid and easy access to the well populated areas. This factor, associated with mobility of the population and economic integration of a much larger area, indicates that the market proposed by the government is too small.

The defendant banks suggest that the appropriate market would include the Allentown-Bethlehem-Easton standard metropolitan area, designated as a standard metropolitan statistical area (SMSA), plus northwestern Hunterdon County in New Jersey and all of Bucks County in Pennsylvania within 15 miles of Phillipsburg. This area would include all of Lehigh County and Northampton County in Pennsylvania, part of Bucks County, Pennsylvania, and Warren and part of Hunterdon Counties in New Jersey. The intervenor adopts the area proposed by the defendant banks but suggests that Lehigh County in Pennsylvania might be excluded except for the City of Allentown. The area suggested by defendant banks and the intervenor as the appropriate geographic market is too large, but, nevertheless, more realistic than the proposals of the government. There is considerable evidence which tends to support the argument of defendant banks that the SMSA is an appropriate geographic market. There is easy access by excellent, non-congested highways from one point in the area to the other and there is a high degree of economic integration. A careful analysis, however, of population, interchange of business transactions and ease of access to banks, considered in conjunction with territorial overlapping of bank business leads this Court to conclude that the following municipalities in New Jersey and Pennsylvania located within relatively short distances (in point of time and travel) from Phillipsburg do comprise the appropriate geographic market:

NEW JERSEY

Warren County

| Municipality | Distance in Mileage from Phillipsburg | Population* |
|---|---|---|
| Phillipsburg | | 18,502 |
| Lopatcong Township | Adjacent | 2,703 |
| Pohatcong Township | Adjacent | 3,543 |
| Greenwich Township | 7 | 1,397 |
| Alpha Borough | 3 | 2,406 |
| Harmony Township | 5 | 2,039 |
| Franklin Township | 11 | 1,729 |
| White Township | 12 | 1,882 |
| Belvidere | 11.5 | 2,636 |
| Oxford | 14 | 1,657 |
| Washington | 12 | 5,723 |
| Washington Township | 13 | 3,055 |
| Mansfield Township | 15 | 2,130 |

* Population figures taken from 1960 census.

Hunterdon County

| Municipality | Distance in Mileage from Phillipsburg | Population* |
|---|---|---|
| Holland Township | 8.5 | 2,495 |
| Bethlehem Township | 11 | 1,090 |
| Union Township | 16 | 1,717 |
| Alexandria Township | 14 | 1,629 |
| Milford | 10.5 | 1,114 |
| Hampton | 13 | 1,135 |
| Glen Gardner | 14 | 787 |
| High Bridge | 17 | 2,148 |
| Clinton | 15.5 | 1,158 |
| Bloombury | 7 | 838 |

PENNSYLVANIA

Northampton County

| Municipality | Distance in Mileage from Phillipsburg | Population* |
|---|---|---|
| Easton | 1 | 31,955 |
| Palmer Township | 5 | 8,823 |
| Glendon Borough | 3.5 | 555 |
| Upper Nazareth | 7 | 2,661 |
| Bethlehem Township | 9 | 6,439 |
| Lower Saucon | 11 | 5,536 |
| Freemansburg | 9 | 1,652 |
| Forks Township | 2 | 3,249 |
| Wilson Borough | 3 | 8,465 |
| Stockerton Borough | 6 | 777 |
| Nazareth | 6.5 | 6,209 |
| Bethlehem | 11 | 55,325 |
| Williams Township | 3 | 2,823 |
| W. Easton Borough | 1 | 1,228 |
| Tatamy Borough | 6 | 762 |
| Lower Nazareth | 6 | 1,729 |
| Hellertown | 11.5 | 6,716 |

Bucks County

| Municipality | Distance in Mileage from Phillipsburg | Population* |
|---|---|---|
| Riegelsville | 7 (approx.) | 953 |
| Nockamixon | 10 " | 1,785 |
| Springfield | 10 " | 3,085 |
| Bridgeton | 10 " | 948 |
| Durham | 10 " | 735 |
| | Total | 215,923 |

* Population figures taken from 1960 census.

The areas beyond the boundary lines of the cities of Phillipsburg, Easton and Bethlehem are sparsely populated but progressing rapidly in development from farm lands to home development and industrial and commercial enterprise. All significant development is taking place beyond the city limits of the well populated cities. For example, the population in Phillipsburg has remained more or less static for a long period of time. Industry and commercial enterprise has been moving out of the well populated areas of the city. The same is true in some degree with the city of Easton. Branch banks have been established beyond city limits to service the needs of a rural community that is growing rapidly in transition from an agricultural economy to commercial and industrial. Distances over good highways between the points above mentioned are short and commuting time by automobile ranges from seven to a maximum of twenty minutes. In fact, considering the ease of access from one point to another over uncongested highways, it would not be an exaggeration to state that it might take less travel time during business hours to journey by automobile from Bethlehem to Phillipsburg than it would to go from the outskirts of Philadelphia to the center of town. Regular movement of population to and from places of business and employment and to stores for consumer goods throughout the entire area above mentioned has, among other things, led the Court to find that economic integration exists in the above described geographic market to such an extent that the lines should not be more narrowly drawn. There is not only little inducement to people residing beyond the city limits of the city of Phillipsburg and the city of Easton to make frequent use of the stores and commercial establishments in those cities, but cogent evidence that the trend is diminishing and even the residents of the cities are finding desirable employment and commercial facilities better suited to their needs in the rapidly developing suburban areas which are not afflicted with congestion in travel or parking of automobiles. Indeed, as to the city of Phillipsburg there has been no dispute that it has been rapidly deteriorating causing business enterprise to be established in the suburbs. The same is true in lesser degree in the city of Easton. Accordingly, to accept either of the government's proposed geographic markets—Phillipsburg and environs or Phillipsburg-Easton and environs—would be to ignore the population, commercial and industrial drift into the suburban areas within a radius of approximately seven to fifteen miles of the cities of Phillipsburg and Easton. There is a preponderance of evidence that the growth of population and of the commercial and industrial enterprise outside city limits are continuing and will be intensified.

If, for instance, there is a prevalent pattern of employment within a described area with regular and constant movement of the population and routine shopping by the population from one point to another to satisfy consumer needs, there is evidence that the area within which the movement takes place is economically integrated as a market. The shopping habits of a buyer, whether in a bank or other market, have vital significance as a factor in the determination of a relevant market. Ease of access to the places of business patronized may be inferred from the buyer's prevalent use of such places of business. Places of employment is also a factor.

The government in its argument for a narrowly drawn banking market has emphasized percentages of banking business which PNB and SNB draw from the city of Phillipsburg and the populated areas immediately adjacent thereto. These percentages have significance only to the extent that they are considered in conjunction with concentration of population. For example, it would be expected that a higher percentage of deposits and loans would be derived from a heavily populated area of the market than from one that was sparsely populated. But that circumstance would not be a valid reason for moving the small

town out of the relevant market. If the ratio of business on a per capita basis were the same or comparable, the small town belongs in the market. Any other approach would exclude most of the suburban areas. Moreover, even if little or no business is presently derived from a particular locality, if there is convenient ease of access to the market, the potential use as a satisfactory, convenient alternate choice should be considered.

## ANTICOMPETITIVE EFFECT OF THE MERGER

■ A merger will be enjoined if its effect in the relevant market "may be" substantially to lessen competition. 15 U.S.C. § 18. The Bank Merger Act of 1966 (12 U.S.C. § 1828) did not change the traditional tests for measuring anticompetitive effect. " * * * Only one conclusion can be drawn from the exhaustive legislative deliberations that preceded passage of the Act [Bank Merger Act 1966]: Congress intended bank mergers first to be subject to the usual antitrust analysis; if a merger failed that scrutiny, it was to be permissible only if the merging banks could establish that the merger's benefits to the community would outweigh its anticompetitive disadvantages. * * * United States v. Third National Bank of Nashville, 390 U.S. 171, 182, 88 S.Ct. 882, 889, 19 L.Ed.2d 1015 (1968). Percentage of market control and concentration in the industry have been recognized tests for evaluating the anticompetitive effect of a merger. *Philadelphia,* supra; Brown Shoe Company v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The court in *Philadelphia,* supra, stated:

Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. * * *

Such a test lightens the burden of proving illegality *only with respect to mergers whose size makes them inherently suspect* in light of Congress' design in § 7 to prevent undue concentration. Furthermore, the test is fully consonant with economic theory. That "[c]ompetition is likely to be greatest when there are many sellers, none of which has any significant market share," is common ground among most economists, and was undoubtedly a premise of congressional reasoning about the antimerger statute. Id. at 363 of 374 U.S., at 1741 of 83 S.Ct. (Emphasis supplied)

■ There is no precise percentage of market control or increase in concentration which can be used as a guide. The decision in each case must turn upon the particular facts in that case. For variations in percentages considered by the Supreme Court see *Philadelphia,* supra; *Brown Shoe Co.,* supra; United States v. Continental Can Co., 378 U.S. 441, 461, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed. 2d 555 (1966). The percentage of market control and increase in concentration must be evaluated in the light of the structure of the entire market, including the existence of a history toward concentration. Where there is a prior history toward concentration, a relatively low percentage of market control or relatively small percentage of increase in concentration may be sufficient to invalidate a merger. Similarly, when the present level of concentration is great, a slight increase may justify disapproval of the merger. The court in United States v. Provident National Bank, 280 F.Supp. 1 (E.D.Pa.1968) said:

We do not find that this merger which would produce a bank controlling approximately 10% of the relevant market is presumptively anticompetitive. This percentage figure is not undue in relation to the composition of the market as a whole. The resultant bank certainly will not have market power which would enable it to persist-

ently behave over substantial periods of time in a non-competitive fashion. * * * The converse is true. The defendant banks desire this market power so that they can behave competitively.

Yet, Congress and the Supreme Court, in carrying out the mandate of Section 7, have stated that one purpose of Section 7 is to arrest a trend toward concentration or a tendency toward monopoly, before the consumer's alternatives disappeared through mergers. * * * This Court accepts the fact that both Provident and Central-Penn would become a better and more competitive bank after the merger, but this fact does not offset the loss of Central-Penn which is a growing and healthy bank in an oligopolistic market. The case which we feel controls the merger before us is United States v. Von's Grocery * * *. [There] the resultant company would control only 7.5% of the total value of retail groceries sold in the * * * market each year. The * * * market was characterized as one where there was a long and continuous trend toward fewer owner-competitors. * * * On these facts alone, the merger was condemned without a functional inquiry into the nature and quality of the competition. The basic purpose of the Sherman and Clayton Acts * * * was to prevent economic concentration in the American economy by keeping a large number of small competitors in business. * * * This view * * * shifts the emphasis of Section 7 from protecting competition to protecting competitors * * *. The Philadelphia banking market unqualifiedly can be characterized as one where there has been a long and continuous trend toward concentration.

Therefore, even if we did find that competition would be improved by this merger * * * "[it] falls within this trend toward merger and toward more concentration, * * * [and] must be ruled anticompetitive under existing antitrust laws. Id. at 19–20.

"[W]hile providing no definite quantitative or qualitative tests by which enforcement agencies could gauge the effects of a given merger to determine whether it may 'substantially' lessen competition or tend toward monopoly, Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry. That is, whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, * * *." Brown Shoe Co., supra, 370 U.S. at 321–322, 82 S.Ct. at 1522.

Competing banks percentage of total assets in the market, deposits and percentage of total market deposits are listed as follows:

| BANK | ASSETS | PERCENTAGE OF TOTAL |
|------|--------|---------------------|
| 1. First National Bank & Trust Co. (Bethlehem, Pa.) | $115,327,000 | 18.96% |
| 2. Union Bank and Trust Co. of Eastern Pa. (Bethlehem) | $ 93,747,000 | 15.41% |
| 3. Easton National Bank & Trust Co. (Easton, Pa.) | $ 75,591,000 | 12.43% |
| 4. Hunterdon County National Bank (Milford, Holland Twp., High Bridge and Clinton Branches) | $ 57,716,000 | 9.49% |

| BANK | ASSETS | PERCENTAGE OF TOTAL |
|---|---|---|
| 5. Nazareth National Bank & Trust Co. (Nazareth, Pa.) | $ 32,014,000 | 5.26% |
| 6. Lafayette Trust Bank (Easton, Pa.) | $ 27,705,000 | 4.56% |
| 7. Phillipsburg National Bank (PNB) (Phillipsburg) | $ 23,861,000 | 3.92% |
| 8. Northampton National Bank (Easton, Pa.) | $ 23,225,000 | 3.82% |
| 9. First Clinton National Bank (Clinton) | $ 21,199,000 | 3.49% |
| 10. First National Bank of Washington (Washington) | $ 20,494,000 | 3.37% |
| 11. First National Bank of Milford (Milford) | $ 20,443,000 | 3.36% |
| 12. First National Bank, Belvidere (Belvidere) | $ 17,303,000 | 2.85% |
| 13. Second National Bank of Phillipsburg (SNB) (Phillipsburg) | $ 17,255,000 | 2.84% |
| 14. Washington Trust Company (Washington) | $ 15,857,000 | 2.61% |
| 15. Second National Bank of Nazareth (Nazareth, Pa.) | $ 15,187,000 | 2.50% |
| 16. Phillipsburg Trust Co. (Phillipsburg) | $ 13,161,000 | 2.16% |
| 17. Saucon Valley Trust Co. (Hellertown, Pa.) | $ 12,947,000 | 2.13% |
| 18. Citizens National Bank of Bloomsbury (Bloomsbury) | $ 5,225,000 | .86% |
| TOTAL | $608,177,000 | 100.02% (due to rounding) |

| BANK | DEPOSITS | PERCENTAGE OF TOTAL |
|---|---|---|
| 1. First National Bank & Trust Co. (Bethlehem, Pa.) | $102,898,000 | 18.98% |
| 2. Union Bank and Trust Co. of Eastern Pa. (Bethlehem) | $ 79,072,000 | 14.58% |
| 3. Easton National Bank & Trust Co. (Easton, Pa.) | $ 67,722,000 | 12.49% |
| 4. Hunterdon County National Bank (Milford, Holland Twp., High Bridge and Clinton Branches) | $ 53,458,000 | 9.86% |

| BANK | DEPOSITS | PERCENTAGE OF TOTAL |
|---|---|---|
| 5. Nazareth National Bank and Trust Co. (Nazareth, Pa.) | $ 28,706,000 | 5.29% |
| 6. Lafayette Trust Bank (Easton, Pa.) | $ 24,309,000 | 4.48% |
| 7. Phillipsburg National Bank (PNB) (Phillipsburg) | $ 22,358,000 | 4.12% |
| 8. First Clinton National Bank (Clinton) | $ 19,396,000 | 3.58% |
| 9. Northampton National Bank (Easton, Pa.) | $ 18,961,000 | 3.50% |
| 10. First National Bank of Milford (Milford) | $ 18,785,000 | 3.46% |
| 11. First National Bank of Washington (Washington) | $ 18,236,000 | 3.36% |
| 12. First National Bank, Belvidere (Belvidere) | $ 16,029,000 | 2.96% |
| 13. Second National Bank of Phillipsburg (SNB) (Phillipsburg) | $ 16,005,000 | 2.95% |
| 14. Washington Trust Company (Washington) | $ 14,506,000 | 2.68% |
| 15. Second National Bank of Nazareth (Nazareth, Pa.) | $ 13,314,000 | 2.46% |
| 16. Phillipsburg Trust Company (Phillipsburg) | $ 12,078,000 | 2.23% |
| 17. Saucon Valley Trust Co. (Hellertown, Pa.) | $ 11,560,000 | 2.13% |
| 18. Citizens National Bank of Bloomsbury (Bloomsbury) | $ 4,788,000 | .88% |
| TOTAL | $542,181,000 | 99.99% |
| | | (due to rounding) |

It would have been appropriate to include the branch bank of the Girard Trust Company which is located in Riegelsville, Pennsylvania. It was omitted in computation of total assets and deposits of the banks in the area because a breakdown of the banking business of the branch was not available. The parent bank, Girard Trust Company of Philadelphia, has total assets of $1,457,713,000 and total deposits of $1,289,941,000 [2]. Obviously these figures could not be used for any meaningful analysis of the structure of the banking market involved here. Such evidence as there is, however, indicates that if the branch bank's assets and deposits were available and included, it would not cause a very substantial comparative change in the above cited percentages either in terms of concentration or deposits. It might also be mentioned at this point in dealing with the subject of satisfactory alternate consumer banking choices that

---

2. Figures shown on Exhibit D–20 as corrected from Exhibit D–17.

other large banks at the fringe of the market, are easily accessible and constitute effective potential competition.

There is no historical trend toward concentration in the banking industry in this market and there is no present concentration. The market is fragmented. The bank patron has many convenient choices. Including the branch bank of Girard Trust Company, there are nineteen banks in the market together with a number of branches to offer convenient services to bank customers. The total population by the 1960 census is 215,923. Percentage control of the market, as indicated by deposits, is well distributed among the existing banks. Considered in terms of percentage increase of assets in the market and increase in percentage of total deposits, the merger will have no substantial effect.

In terms of assets PNB is the seventh largest bank and SNB is the thirteenth. After the merger, the new bank PNB-SNB will be the fifth largest bank with 6.76% of total assets in the market. The two largest banks, First National Bank and Trust Company, Bethlehem, and Union Bank and Trust of Eastern Pennsylvania, Bethlehem, hold 34.37% of all of the assets in the market. The four largest banks, First National Bank and Trust Company, Bethlehem; Union Bank and Trust of Eastern Pennsylvania, Bethlehem; Easton National Bank & Trust Company and Hunterdon County National Bank hold 56.29% of the total assets. The five largest, including the four just mentioned plus Nazareth National Bank and Trust Company, hold 61.55%. After the merger, the con-

centration of the four largest banks will remain unchanged. It is only when the five largest banks are considered that there is a change in concentration. This change is from the pre-merger five largest banks concentration of 61.55% to a post-merger five largest banks concentration of 63.05%. The percentage of increase in concentration is 2.4%. The percentage of total assets of the merged bank in the market will be 6.76%.

PNB ranks seventh in percentage of deposits and SNB ranks thirteenth. After the merger the new bank PNB-SNB will rank fifth with 7.07% of total deposits in the market. The two largest banks have 33.56% of the deposits; the four largest have 55.91%; the five largest have 61.20%. After the merger, the five largest banks concentration will be 62.98%. The percentage of increase in concentration after the merger is 2.9%. The percentage of total deposits of the merged bank in the market will be 7.07%.

The percentage figures cited above indicate clearly that the merger will not cause any substantial increase in concentration of economic power or substantial percentage increase of the share of the merged bank in total deposits in the market.

Ease of access to the market is also a factor that deserves consideration in evaluating the anticompetitive effects of a merger. It is not difficult for a small group of business men to raise sufficient capital to establish a new small bank when the banking needs of the community are sufficient to warrant approval of the charter. N.J.S.A. 17:9A–4, 5 [3].

3. N.J.S.A. 17:9A–4 Capital stock and surplus
A. The capital stock of every bank hereafter organized shall amount to not less than:
(1) $100,000.00, if the population of the municipality wherein the principal office of the bank is to be located does does not exceed 10,000;
(2) $150,000.00, if the population of such municipality exceeds 10,000, but does not exceed 50,000;
(3) $200,000.00, if the population of such municipality exceeds 50,000, but does not exceed 100,000;
(4) $300,000.00, if the population of such municipality exceeds 100,000, but does not exceed 200,000;
(5) $500,000.00, if the population of such municipality exceeds 200,000; provided that, if the certificate of incorporation states that the bank shall be authorized to exercise all or any of the powers specified in section 28, its capi-

Warren County, New Jersey, is now included by statute in a banking district consisting of the counties of Bergen, Essex, Hudson, Morris, Passaic, Sussex and Warren. Large city banks in Newark and in other well populated cities in the counties mentioned can now establish branch banks in Warren County in any municipality in which no banking institution has its principal office or a branch office and in any municipality which has a population of 7,500 or more where no banking institution has its principal office despite the fact that there are one or more branch offices of other banking institutions in that municipality. Pamphlet Laws 1968, Chapter 415, N.J.S.A. 17:9A–19, approved January 17, 1969 and effective July 17, 1969 [4].

Pursuant to these statutory provisions there are many locations in Warren and Hunterdon Counties where either a new bank or a branch bank could be established.

In the light of the absence of any historical trend toward concentration or the existence of any present undue concentration, there can be no *presumptive* inference of anticompetitive effect. Such effect in this case must be established by a preponderance of the evidence. Evidence from which anticompetitive effect could be inferred is meager and not persuasive. It was suggested that mergers tend to cause an increase in interest charged on loans and a decrease in interest paid on deposits. The evidence does not support this theory. Nor did the government point with evidence to any other particular banking service which might be adversely affected by the merger. Indeed, there is a preponderance of evidence to support a conclusion that the merger would have procompetitive effect if the merged bank, employing its increased resources, adopted aggressive policies which would have a tendency to stimulate other small banks to become more aggressive in serving the needs of the community. Robert Leupo, Executive Vice President of Phillipsburg Trust Company, described PNB

---

tal stock shall be not less than $500,-000.00.

B. If the commissioner shall find that the principal office of a bank will be located in a municipality which serves as a business or as a banking center for outlying districts not otherwise adequately provided with banking facilities, so that such bank will transact business with a substantial number of persons who do not reside in the said municipality; or if the commissioner shall find that, because of its location, a bank will transact a substantial part of its business with persons from a neighboring municipality or municipalities, the commissioner may, in his discretion, require that the capital stock with which such bank shall commence business, shall equal the minimum capital stock which would be required of the bank if its principal office were to be located in a municipality having a population equal to that of the combined populations of the municipality in which it is to be located and of the area, outside such municipality, which it will serve.

c. Every bank hereafter organized shall commence business with a surplus at least equal to 20% of its capital stock. N.J.S.A. 17:9A–5 Reserve or organization expense

Every bank shall, on its organization, establish a fund at least equal to 5% of its capital stock as a reserve fund for organization expense. Organization expense shall mean all lawful expense incurred preliminary to commencement of business. Any unexpended balance in the fund shall be credited to undivided profits.

4. B. No bank or savings bank shall establish or maintain a branch office which is located outside the municipality in which it maintains its principal office; except that a bank or savings bank may establish and maintain a branch office or offices anywhere in the same banking district as that in which it maintains its principal office:

\* \* \* \* \*

(3) when each proposed branch will be established in a municipality in which no banking institution has its principal office or a branch office; except that, when a municipality has a population of 7,500 or more, and no banking institution has its principal office therein, a bank or savings bank may establish and maintain a branch office or offices in such municipality notwithstanding the presence therein of one or more branch offices of one or more banking institutions.

and SNB as banks in direct competition with his bank describing it as healthy competition beneficial to his bank. He stated:

> I would say it was healthy competition, healthy competition to the extent that we have grown, that we have been recognized and we have progressed. I would say it was healthy competition.

It seems from the evidence that most of the small banks in the area have not been interested in building up banking services except to the extent that aggressive competitors led the way. An ultraconservative policy of banking seems to have been prevailing with reluctant change occurring only when profits and future growth were threatened by virulent competitors. There is an attitude of complacency on the part of many banks. They are content to continue outmoded banking practice and reluctant to risk changes which would improve service and extend services over a greater area to a larger segment of the population.

■ This Court finds that plaintiff has failed to sustain its burden of proof to establish by a preponderance of the evidence that the merger would have any measurable anticompetitive effect. The Court finds, however, that since the subject of serving the convenience and needs of the community has been well developed by the evidence, that it is appropriate to discuss this defense.

## CONVENIENCE AND NEEDS OF THE COMMUNITY TO BE SERVED

There are two banking services which must be improved in the area to satisfy present and rapidly increasing need. Lending limits of the small banks are not sufficient to satisfy loan requirements for substantial industrial and commercial enterprise. There are only a few of the larger banks in the area that can handle single loans of $75,000 and upward. As a result, a substantial volume of credit sought by industrial and commercial enterprise must be arranged either directly with the large city banks outside the area or by way of a participating loan through a local bank. There is a definite lack of competent trust service and here again servicing of substantial trust accounts must be obtained outside the community with the larger banks that maintain trust departments with expertise in the field of investments. Very small banks like PNB and SNB do not have the financial capacity to maintain separate commercial and industrial lending departments and trust departments headed by a full-time officer with specialized expertise. If the merger is approved, the merged bank can establish these departments and staff them with personnel capable of the kind of loan and trust service that patrons must, in large part, now seek outside the community.

There is no doubt that a well trained, full-time specialist in a loan department could serve a rapidly increasing need of commercial and industrial enterprise in the community by readily available expert and diversified credit planning and counsel. The same is true with respect to a trust department.

A larger bank than either PNB or SNB is necessary to furnish better loan and trust service to the community. There are very few banks in the area that are even partially equipped to furnish large commercial and industrial enterprise with the kind of trust and loan banking service that is needed. Another larger bank offering these services would diminish the existing inadequacy.

The salaries which a full-time specialist in a loan department and a trust department could command are beyond the financial reach of either PNB or SNB. In fact, it seems that highly specialized experts in loan planning service and trust service to bank patrons are constantly sought by banks and difficult to obtain. The expense of highly specialized service in lending money and servicing trust funds can be incurred only by banks larger than either PNB or SNB. The initial salaries of the necessary specialists is not the only consideration. The substantial salaries which ei-

ther bank would have to pay would cause an upgrading of all salaries from the president down as a matter of morale. In addition, there would be the matter of fringe benefits. Small banks do not pay high salaries and fringe benefits are limited.

The government stresses the argument that neither PNB nor SNB have made any genuine effort to recruit specialists to head a commercial and industrial loan department or a trust department, but the evidence does establish that such specialists are not easy to find and not likely to be induced to accept employment for a small salary or with a very small bank. It is, however, clear from the evidence that neither bank can afford the expense of employing well trained specialists to head a loan and trust department. There was tentative exploration of the possibility of obtaining qualified bank officers which ceased when it became clear that the expense was out of reach.

The forecast is that if the merger is approved, the merged bank will set up a commercial and industrial loan department headed by a bank officer who is a specialist in the field and would do the same as to a trust department. The merged bank would have capacity to do so and there is no reason to believe that it would not do so as a matter of self-interest in future growth and better service to the community.

Illustration by excerpts from testimony of some of the witnesses [5] clearly establishes the fact that a larger bank could improve the present inadequate bank lending and trust service. It should be emphasized that present need will become more critical with future growth of the community. A business man who operates a television sales and service business in Phillipsburg with total assets of approximately $200,000, stated:

Q. Have you had to borrow money from the Phillipsburg National?

A. Yes. Originally when I purchased the store, this business on Memorial Parkway, four years ago this November, I approached them and they extended to me a line of credit of $50,000 for floor planning. Within I would say approximately two years ago I bought this business and building on a sales purchase agreement, and I wanted to pay the party off whom I purchased it from, and I approached the bank for a mortgage, which was approved, but at this time I had to take a cut in my floor planning account of $25,000 to allow for the mortgage I was seeking.

Q. That is with the mortgage and your borrowing you would have exceeded the limits?

A. Yes, sir.

Q. Where did you turn in order to get credit?

A. Well, I had to increase my line of credit with First Pennsylvania Bank in Philadelphia and also with General Electric Credit Corporation.

Q. Would you prefer doing business with the Phillipsburg National?

A. Yes I would, primarily because I am well known at the bank, and as far as the business aspects, the rate of interest was less, and now in comparison to General Electric Credit Corporation their rates are 1.4 per cent per month on unpaid balances, whereas until the last increase to 7 per cent per year it was a half per cent per month at the local bank.

Q. So you are really paying 15 per cent?

A. That is right, on a yearly basis. At the First Pennsylvania Bank the rate is approximately 9 per cent per year at this time.

Q. And what are your credit needs at this moment?

A. Well, that fluctuates. While going into the greatest part of our business—in other words, the last quarter

5. Names of witnesses are omitted because of request that financial problems of a confidential nature not be made public.

of the year is usually the bulk of our business, and at this time of the year we do need more moneys to display more merchandise and too, the biggest part of our business is done through this period of time.

Q. Well what limit would you desire or what uppermost limits?

A. Well, in other words, with mortgages and other moneys that I would need as far as floor planning—in other words, a gross amount of approximately $200,000.

Q. Are there any other disadvantages of doing business with the General Electric Credit outfit?

A. Well, with any distributor it is much easier if you have moneys available when you go to purchase a product, say during their—during the year most of these companies have at least four shows, and at this time if the money is available to me—in other words, if I would go and be able to buy more or less on a cash basis I can buy the merchandise that I want, whereas what they do to entice a person into buying their packages, they do mix products in there which are slow movers, and in order to buy what we want we must take these other items also.

Q. If you have the money from the bank and went in there—

A. You can purchase just what you want.

Q. Then you wouldn't have the slow items.

A. This is right, sir.

A manufacturer in Greenwich Township stated:

Q. What do you contemplate your borrowing needs will be in the next few years?

A. We are getting into more sophisticated types of machines, which are high priced; our latest acquisition, a year and a half ago, was a $65,000 installation. The next ones, in all probability, will be in the range of $100,-000 per machine.

Q. What do you contemplate your credit needs then to be?

A. The situation obviously has to be determined when it arises, but I would say that our needs will be between $100,000 and $200,000.

Q. Where are you banking presently?

A. At the Second National Bank in Phillipsburg.

Q. Would a merger of these two banks be of assistance to you?

A. I believe a larger bank in Phillipsburg will be a definite asset to me.

Q. For how long a period do you usually want to borrow money?

A. Our history has been on machinery purchases we have borrowed on the basis of three to five years.

Q. Isn't it possible to get this through the company that sells you the product?

A. Yes.

Q. Why do you prefer the bank?

A. It is much more convenient to do business locally and it is cheaper.

Joseph G. Varga, Vice President of Phillipsburg National Bank, describing the credit situation at the bank, stated:

A. We have requests for commercial and industrial loans for people that are starting into business. They would run in the neighborhood of 25,000, 75,000 and upwards. Our biggest concern at this time is the fact that some of our customers who have gone into business loans with us are continually growing. They are asking us for larger lines of credit. They also ask us for commercial mortgages, and at the lending limit that we are now these corporations and business houses are outgrowing our bank.

Q. It is not always a loan, is it, that they want as much as a line of credit.

* * * * * *

A. The lines of credit are established for various business houses and in order for them to get better trade credit corporations or people that are doing

trading in our area will call the bank and ask what kind of demand deposit balance the corporation has, and then they would ask what kind of line of credit, "Are you giving them a line of credit?" Is their credibility worth so much, and we would say, "Well, we are lending them a certain figure on an open line."

Q. How about the practice with respect to contractors bidding on jobs?

A. One of the requirements of a contractor bidding on a school program or something like that is to have an established line of credit at a bank, and this enables him to submit his bid.

A Ford dealer stated:

Q. And when you first came to Phillipsburg did you endeavor to do business with a bank there?

A. Yes, the Phillipsburg National Bank & Trust Company.

Q. Will you describe your problem?

A. Well, the bank was recommended to me and I opened a business account there, and they had an automobile department at that time, and I tried to get a line of credit for my floor plan. At that time it was about $150,-000, and they couldn't handle it. Their loan limit there wouldn't permit this, and I subsequently had to go to Ford Motor Credit Company, which was at that time in Newark.

Q. Are you doing business with them?

A. With Ford Motor Credit Company.

Q. What would your preference have been?

A. At that time I wanted to go to a local bank due to the nature of our business.

A business man in Phillipsburg, speaking of the need for a loan officer and a trust department stated:

Q. What would you say about a merger of these two banks so far as your doing business with them is concerned?

A. I would welcome it because of the loan limits. For example, at the first of the year when I was more heavily committed in the market than I am now, I owed about five hundred- odd thousand dollars to the various banks, and I hit a loan limit at that time of about $100,000. I don't know if it was just around that time, but I know at one time Mr. Murray told me they wouldn't go over a hundred thousand. I hit that limit. I hit an $88,000 loan limit at the Second National and a hundred thousand loan limit at the Phillipsburg Trust, so I had to go into Easton. Actually I think it would be much more convenient. For one thing, I think that a larger bank could afford to have somebody in their loan department that would do that only, that would be more familiar with securities. This is not derogatory to any bank.

Q. Especially since you are a borrower.

A. Yes. Sometimes I have to explain to them what may or may not be done, you know, and someone who is more familiar with it—I also feel that if they could afford to hire or be large enough to have someone with some knowledge of this, I think they would do a lot better in their business. There are a lot of collateral loans that are going begging.

Q. Where do they get it?

A. Sometimes they don't even know they can get it. Well, usually they go elsewhere. I imagine that the banks in Allentown do a lot of that. They are much larger.

Q. Is there a need in the area you have described for trust services?

A. Oh yes. I think this is a very big thing. I know this has happened to me, so I'm sure it has happened to the rest of the community. The country has become more affluent and the average workman today is coming into my place and spending—the average workman today is much more affluent. I am doing a security busi-

ness today with people that never dreamed of owning a share of stock, and one fellow asked me to set up a sort of estate based on mutual funds, and he was talking about five or six thousand dollars. This is about three or four weeks ago, and I told him if anything happened it would be worth a lot more money. Most people don't realize they have an estate. There is insurance and if the house is sold this is a lump sum and there are many other things that are worth money that don't show up until there is an estate, and frankly a lot of women— we live in an area where there [are] a lot of foreign-born people, and some of them are not terribly educated, and a lot of these people should have some sort of reliable trust setup so the estate wouldn't be dissipated or improperly handled.

Q. How about pension funds?

A. Oh, well every union is looking for a pension fund, and the way some of them are being handled I think it would be a lot better if a trust officer looked after them.

A department store owner stated:

Q. Do you have any business which could be classified as trust business?

A. We have set up a long time ago profit-sharing trusts in our Easton store which was followed by profit-sharing trusts in the Bethlehem store. Our realty corporation over there and in the new Phillipsburg store—is that what you refer to?

Q. Yes. If the Phillipsburg bank had a full time trust officer would there be a possibility that you would turn some business in that direction?

A. We would very much like to, and as a matter of fact part of this hinges in our feeling the competitive odds against a small independent retailer. He has to exercise every bit of ingenuity he has to overcome the competitive effect of nationally known outlets and big advertising campaigns, and we do everything we can to have the public in the area aware that we are part of the community. One of them is to bank there, to borrow there, to have the bank use every service, give us every service they can, and the minute the Phillipsburg National has a trust department the trust account for the Phillipsburg store will be moved over there. We have that in our trust indenture. It can be changed.

Q. You know they have a trust department there now?

A. Well, we would like to have a complete service.

Q. How about borrowing? I would assume being in the merchandising business that you borrow over the years?

A. When we opened the Phillipsburg store, prior to opening the Phillipsburg store our first move was to check with the Phillipsburg National, because we felt an examination of the statements indicated that they were the one, the only one that could come anywhere near giving us what we needed, and at that time I believe their top line capacity was about $90,000. We took it all. We reduced that. I believe we still have some, but our present expansion is going to require our reentering into the matter of borrowing from some source, and we prefer it to be a local bank. This is very shortly, within the next month or two.

Q. What do you think the extent of that borrowing will be?

A. It wouldn't be less than a couple of hundred thousand dollars, and it might go considerably higher.

Q. Where would you take that?

A. Where would we borrow it?

Q. Yes.

A. Well, we would borrow every nickel we could from the Phillipsburg bank, and after that it would be a matter of finding out how much we needed and shopping around.

The foregoing are only a few excerpts from a volume of evidence which

clearly establishes the inadequacy of loan service and trust service available in the community and the need for improvement in that aspect of local banking. As commercial and industrial enterprise continue to grow and increase numerically in the area, a substantial part of banking business will have to be done outside the community. This is not only inconvenient, but economically unhealthy for future development. One who procures a loan from a bank is likely to do his other business with that bank, including the checking account. The demand deposit generates capacity for increased expansion of credit that may be applied to stimulate industrial and commercial growth with all of its attendant benefits, including greater opportunities for employment.

In the trust field it is desirable that pension funds of unions and large industries and profit sharing plans as well as trust funds from other sources be administered locally.

It was emphasized by the government that local loan needs could be satisfied by participating loans. William F. Greenley, Jr., Senior Vice President of Fidelity Union Trust Company, a corresponding bank, commenting upon the disadvantages of such loans, stated:

Q. Is there any disadvantage in participations?

A. Yes. I think there is. There is a disadvantage to this extent, first of all there is a general money market. When funds were tight, such as they were part of this summer and certainly a year before this, I think most banks or any smaller bank had a real problem getting a participation. Now, not only is it the general market money that decides this, but it can be the special pattern of loans and deposits that the correspondent bank or banks may have. At certain times of the year certainly you can get— other things being equal—you can get a participation from us. At other times we would not care to participate because we have our funds either fully

tied up or perhaps more gainfully employed.

There is the other portion to it, too, that many times where a participation is sought it is the type of business that you want to be right on hand watching. I am thinking now of say a restaurant or an unseasoned business where you just feel you want to be in there all the time. There is also the thing, too, with a participation loan, that generally the bank giving the overage requires to be paid out first, so that if things go fine this is fine, but also if it is a wavery situation the local bank is pretty well stuck in there.

Another source of borrowed money is the finance company to which business men must resort when lending limits of the local banks are inadequate. It has been said that finance companies cannot compete with banks because they are not primary accumulators of money and must borrow for their needs from banks and, as a consequence, must demand a higher rate of interest from borrowers. This picture seems to be changing. Professor Homer Kripke with extensive experience in the development of finance company business traced the history with analysis of present operations. According to his testimony, with which the Court was impressed, finance companies presently borrow very little money from banks and today they can outbid the banks for loans. They can and do obtain million dollar loans from all large industrial corporations in the United States such as the oil companies, tobacco companies and the large chemical companies. The evidence indicates that finance companies occupy an advantageous position in the lending market where there is borrower necessity to use their lending capacity. This seems to be particularly true in the matter of floor planning and other large inventory financing. The impact here is not only upon the business dealer, but also upon the individual consumer whose paper goes back from the dealer to the finance company at a higher rate of in-

 **667**

terest than would be the case if it came into the hands of a bank through dealer financing by a bank. Larger bank lending limits will meet an urgent need of business men and be ultimately beneficial to the individual consumer in financing purchase of goods.

There was much discussion about the effect of the Bank Merger Act of 1966 upon application of Section 7 of the Clayton Act to mergers. The traditional test for determining anticompetitive effect was not changed. *Third National Bank of Nashville,* supra. But while fragmentation of the market as opposed to concentration is still favored, it is clear that Congress did not intend to emphasize fragmentation to that point *in the banking industry* where there would be substantial detriment to the consumer. For historical comparative background see Brown Shoe Co., supra, 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed. 2d 510[6]. Strong banks capable of stimulating industrial and commercial growth and serving individual needs economically are vital to a prosperous economy and a higher standard of living. The Court finds that there is a preponderance of evidence showing that any conceivable anticompetitive effect of the merger is clearly outweighed by the effects of the transaction in meeting the needs and convenience of the community to be served.

## CONCLUSION

For the reasons stated the Court finds that plaintiff has failed to establish by a preponderance of the evidence that the proposed merger would have any anticompetitive effect and, further, that even if there were *de minimis* anticompetitive effect in the narrowly drawn market proposed by the government, such effect is clearly outweighed by the convenience and needs of the community to be served by the merged bank.

An appropriate order may be submitted for entry of judgment in favor of defendants and the intervenor and against plaintiff without costs.

6. "Of course, some of the results of large integrated or chain operations are beneficial to consumers. Their expansion is not rendered unlawful by the mere fact that small independent stores may be adversely affected. It is competition, not competitors, which the Act protects. But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision." Id. at 344, 82 S.Ct. at 1534.