UNITED STATES of America

v.

COUNTY NATIONAL BANK OF BEN-NINGTON and Catamount National Bank, Defendants,

and

William B. Camp, Comptroller of the Currency, Intervenor.

Civ. A. No. 6088.

United States District Court,
D. Vermont.

Jan. 27, 1972.

**86**

George W. F. Cook, U. S. Atty., Rutland, Vt., Bernard Wehrmann, Dept. of Justice, New York City, for plaintiff.

John H. Williams, II, Williams, Witten & Carter, Bennington, Vt., and Eugene J. Metzger, Metzger, Schwarz, McKenna & Kempler, Washington, D. C., for defendants.

Charles H. McEnerney, Sr. Atty., Office of the Comptroller of the Currency, Washington, D. C., for intervenor.

## OPINION AND ORDER

WATERMAN, Circuit Judge:[1]

On November 5, 1970 the United States filed this civil complaint under Section 15 of the Clayton Act, 15 U.S.C. § 25, seeking to enjoin as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, a proposed merger of Catamount National Bank and County National Bank of Bennington, each of which has its principal place of business in Bennington County, Vermont, and is headquartered there.

On October 9, 1970 the Comptroller of the Currency had approved the merger under the Bank Merger Act of 1966, 12 U.S.C. § 1828(c), and to defend his approval he intervened as of right as a party herein pursuant to the provisions of 12 U.S.C. § 1828(c) (7) (D), and in accordance with Rule 24(a) (1) Fed.R. Civ.P.

Thereafter the defendant banks and the intervenor each moved to dismiss the Government's complaint for failure to state a claim upon which relief could be granted, maintaining that the alleged relevant geographic market the Government set forth in its complaint, namely a socalled "Bennington area," is "economically, demographically and geographically" of insufficient size to constitute a "section of the country" within the intendment of Section 7 of the Clayton Act. The complaint defines the "Bennington area" as "the area consisting of the townships of Arlington, Sunderland, Shaftsbury, Glastenbury, Bennington, Woodford, Searsburg, Pownal, Stamford, and Readsboro, located in central and southern Bennington County in the State of Vermont." The learned district judge denied the motions to dismiss.

On March 8, 1971, the Comptroller, and on March 10, 1971, the defendants, filed their answers and simultaneously moved for summary judgment in their favor on the same grounds they had set

1. Of the U.S. Court of Appeals, 2 Cir., sitting by designation.

After the untimely death on January 9, 1972 of Chief Judge Leddy the case was assigned to Judge Waterman for opinion and disposition. Judge Waterman has had the benefit of Judge Leddy's valuable comprehensive memoranda and notes.

forth in their earlier motions to dismiss. The Government then cross-moved for summary judgment in its favor or for a plaintiff's judgment on the pleadings. By opinion and order Chief Judge Leddy denied all these motions because it was his belief at that time that there were substantial factual questions which had not been resolved. United States v. County National Bank, 330 F.Supp. 155 (D.Vt.1971). The parties by stipulation, by affidavit, and by judicial admission, have disposed of all the factual questions they wish the court to resolve, have renewed their respective motions for summary judgment, and have submitted a sole legal issue for judicial decision.

The parties have stipulated, and the defendants admit, the following facts:

"8. For the purposes of this case, commercial banking is the appropriate line of commerce in which to measure the effects of the proposed merger."

"10. The major portion of the business of each of the defendant banks is done with customers located in the Bennington Area as defined in the Complaint."

"11. The Bennington Area is the geographic area of major competitive overlap between the defendant banks. It is a relevant geographic market within which the effects of the merger can be measured. It is the geographic area within which the effect of the merger would be direct and immediate." [See United States v. Phillipsburg National Bank & Trust Co., 399 U.S. 350, 362, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970).]

"20. The proposed merger would, if consummated, tend substantially to lessen competition and to create a mo-

nopoly, as those terms are comprehended by Section 7 of the Clayton Act, in commercial banking in the Bennington Area."

The parties have further agreed that:

"22. The only issue remaining between plaintiff on the one hand and defendants and intervenor on the other is a legal issue. That issue is: Is the economic, demographic or geographic significance or size of the Bennington area, in relation to the United States as a whole, relevant or material to a determination of whether or not the Bennington Area is a "section of the country" within the meaning of Section 7 of the Clayton Act and, if so, does the Bennington Area meet the requirements of those standards."

And have further stipulated that:

"23. For the purposes of this case, it is agreed that, if the "Bennington Area" is determined to constitute a 'section of the country' within the meaning of Section 7 of the Clayton Act, the proposed merger would violate said statute."

Therefore, for the purpose of determining the rights of the parties in this case the only issue for decision is whether the "Bennington Area" is too insignificant economically, demographically and geographically" to be a "section of the country" that is reachable by Section 7 of the Clayton Act and within which mergers, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly," are proscribed. The defendant banks and the Comptroller claim such an insignificance —the United States claims the contrary.

 At the outset of our discussion [2] it is important to note that

---

2. The parties have stipulated that this "merger would, if consummated, tend substantially to lessen competition and to create a monopoly." Nevertheless, it is not amiss to point out that, even though a bank merger may have anticompetitive effects, the Bank Merger Act of 1966, 12

U.S.C. § 1828(c), provides that a national bank merger may be approved by the Comptroller if he finds:

. . . that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in

the identical argument advanced by the defendants and the intervenor here was rejected in 1970 by the United States Supreme Court when the Phillipsburg, N. J.-Easton, Pa. geographical area was under consideration in the *Phillipsburg* case, *supra*.[3] The Court, after stating at 399 U.S. 362, 90 S.Ct. at 2043 that, "Commercial realities in the banking industry make clear that banks generally have a very localized business" said:

> Appellee banks argue that the Phillipsburg-Easton "cannot conceivably be considered a 'market' for antitrust purposes," on the ground that it is not an "economically significant section of the country." They cite our language in *Brown Shoe, supra* [Brown Shoe Co. v. United States] 370 U.S. [294], at 320, 82 S.Ct. [1502], at 1521 [8 L. Ed.2d 510], that "[t]he deletion of the word 'community' in the original [Clayton] Act's description of the relevant geographic market is another illustration of Congress' desire to indicate that its concern was with the adverse effects of a given merger on competition only in an economically significant 'section' of the country." In *Brown Shoe*, however, we found

"relevant geographic markets" in cities "with a population exceeding 10,000 and their environs." *Id.*, at 339, 82 S.Ct., at 1531. Phillipsburg-Easton and their immediate environs had a population of almost 90,000 in 1960. Seven banks compete for their business. This market is clearly an economically significant section of the country for the purposes of § 7.

This rejection by the Court of the very argument now presented reflects the pattern the Court has followed in previous decisions when Section 7 of the Clayton Act has been construed. Section 7 bars mergers that may substantially lessen competition in "any" section of the country, 15 U.S.C. § 18, and "The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect *somewhere* in the United States . . . ." United States v. Pabst Brewing Co., 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966) (emphasis added). But even without so broadly interpreting the phrase "any section of the country" it would appear that a court is required to find that the Bennington area is a "section of the coun-

---

meeting the convenience and needs of the community to be served. 12 U.S.C. § 1828(c) (5) (B).

The Act further provides, 12 U.S.C. § 1828(c) (7) (B):

(B) In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15, the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5).

However, in a judicial proceeding the "convenience and needs of the community to be served" must be pleaded as an affirmative defense, and the defendants have the burden of proof on the issue so pleaded, United States v. First City National Bank of Houston, 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). Inasmuch as the proponents of the merger have refused to plead this statutory excep-

tion, the court is precluded from inquiring into or considering this subject-matter.

3. For instance, the brief of the Comptroller filed with the U. S. Supreme Court in *Phillipsburg* (p. 56) contained the following with proper references to the transcript of the hearing below:

Certainly, Phillipsburg, New Jersey, which has had no population change for over 15 years, has no land available for development, . . . and has such a limited variety of goods offered by its stores that one cannot purchase a man's suit of clothes there, . . . cannot by any stretch of the imagination be considered a "section of the country," or an "economically significant market" within the meaning of Section 7 of the Clayton Act.

And also (p. 59):

Appellee Intervenor rejects the *reductio ad absurdum* which would conceive as "economically significant" or of "commercial importance" a so-called market as Phillipsburg, New Jersey.

try" on the basis of pertinent case law developed by the Court in other opinions. The Court, depending upon the product involved and the extent that competition is likely to be affected by the combine, has repeatedly construed Section 7 as being designed to preserve and protect the benefits of competition in smaller communities as well as in large metropolitan, regional and national areas. Cf. *Phillipsburg, supra;* Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The defendants and the intervenor postulate that the "Bennington area" is "economically, demographically and geographically" of insufficient size to be a section of the country protected by Section 7 for any purpose or for any product. It would appear, however, that this position is contrary to that adopted in decisions of the Supreme Court and belies the manifestations of congressional intent indicating that the particular product involved is of substantial importance in determining an area constituting a section of the country for purposes of the Clayton Act. In determining whether the "Bennington area" is a section of the country within the purview of Section 7 of the Clayton Act, the Senate Committee report dealing with Section 7 makes it clear that we must closely examine the relevant line of commerce or the relevant product in issue, which, in this case, is commercial banking. In that report it is stated:

"Section of the country"

Although it is, of course, impossible to define rigidly what constitutes a "section of the country," certain broad standards reflecting the general intent of Congress can be set forth to guide the Commission and the courts in their interpretation.

What constitutes a section will vary with the nature of the product. Owing to the differences in the size and character of markets, it would be meaningless, from an economic point of view, to attempt to apply for all products a uniform definition of section, whether such a definition were based upon miles, population, income, or any other unit of measurement. A section which would be economically significant for a heavy, durable product, such as large machine tools, might well be meaningless for a light product, such as milk. S.Rep.No.1775, 81st Cong., 2d Sess. See 1950 U.S. Code, Cong. & Admin.News, pp. 4293, 4297–4298.[4]

The business of banking, as the U. S. Supreme Court pointed out, is of a localized nature. " 'Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance.' " *Phillipsburg, supra,* 399 U.S. at 362–363, 90 S.Ct. at 2043, quoting United States v. Philadelphia National Bank, 374 U.S. 321, 358, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Localization of the banking industry is particularly significant in the case of the small local customer: "For such persons, geographic convenience can be a more powerful influence than the availability of a higher rate of interest at a more distant, though still nearby, bank. The small borrower, if he is to have his needs met, must often depend upon his community reputation and upon his relationship with the local banker."[5] *Phillipsburg,*

4. See the Court's exhaustive study of the congressional intent in Brown Shoe Co. v. United States, 370 U.S. 294, 311–323, 82 S.Ct. 1502, 8 L.Ed.2d 510, and, particularly applicable to the issue here, the statement at 320 n. 35, 82 S.Ct. at 1521: "[I]t became clear that the 'section' of the country to which the Act was to apply, referred not to a definite geographic area of the country, but rather the geographic area of effective competition in the relevant line of commerce."

5. In light of this language, we find it quite persuasive to the determination of the issue here that although four banks have banking offices within the "Bennington Area," only the two defendant banks are headquartered in the area. Inasmuch as it can reasonably be anticipated that the

*supra,* 399 U.S. at 363–364, 90 S.Ct. at 2043.

The "Bennington Area" has, according to the 1970 census, a population of 23,733. It comprises an area of 408 square miles. In the "Bennington Area" the Vermont National Bank of Brattleboro and the Vermont Bank & Trust Company of Brattleboro have branch offices. As of June 30, 1971 defendant County National Bank, a bank which has no branches outside the "Bennington Area" had assets of $19,084,000 and deposits of $16,704,000. As of June 30, 1971 defendant Catamount National Bank, though it had gross assets of $23,959,000 and overall deposits of $21,564,000, had allocated to its banking houses within the "Bennington Area" assets of $17,976,000 and deposits of $16,179,000. On account solely at offices within the "Bennington Area" Vermont National Bank only had assets of $4,290,000 and deposits of $5,080,000. Vermont Bank and Trust Company on account solely at offices within the "Bennington Area" had the most assets and largest deposits there of the four banks, $23,511,000 and $21,803,000, respectively. Each of the Brattleboro banks, headquartered some 40 miles from the Village of Bennington, are substantially more than twice as large as the two defendant banks would be if merged into one bank, but in the "Bennington Area" the new bank would have substantially more assets and more deposits than the sums of the assets and deposits that the two Brattleboro banks have on account within the "Bennington Area." As of January 1, 1970 the parties have submitted that in terms of total deposits defendant Catamount ranked in the 2936th place among the country's banks and County National in the 3512th place. They have also submitted the information that if the two banks were combined the merged bank would occupy the 1544th place with deposits in excess of $33,000,000.

With these stipulated facts before us a comparison of the banking situation the proposed merger would create in the "Bennington Area" with that which was planned to be created in the Phillipsburg-Easton area is indicated in order to assess whether the "Bennington Area" constitutes a "section of the country" within the meaning of Section 7 of the Clayton Act insofar as concerns the "product market" of commercial banking. The combined assets of the two banks headquartered in the "Bennington Area" would equal $42,043,000; those of the proposed resulting bank in the Phillipsburg area $41,100,000, 399 U.S. at 354, 90 S.Ct. 2035. Within the defined "Bennington Area" having a population of 24,000 people the merged bank would be the largest of three banks in terms of localized assets and deposits; in the larger Phillipsburg area, population 90,000, the merged bank would have become only the second largest of six banks. Concentrated commercial banking would result from the proposed Bennington area merger to the extent that the merged bank would have 57% of the total assets and 55% of the total deposits on account at offices within the "Bennington Area"; the resulting bank in Phillipsburg-Easton would have had but 19.3% of the total bank assets and 42.6% of total deposits, 399 U.S. 357, 90 S.Ct. 2035.

The Court in *Phillipsburg,* 399 U.S. 357–358, 90 S.Ct. 2040 entertained no doubt that the factual pattern there required a "determination whether the merger passes muster under the antitrust standards of United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), which were preserved in the Bank Merger Act of 1966. United States v. First [City] National Bank of Houston, *supra* [386

officials with the ultimate power and responsibility for loan approval will be located at a bank's headquarters, the geographic location of those headquarters may be vitally important to the local customer who wishes to avoid travelling to a more distant bank headquarters for his banking services and who wishes to deal with a local loan officer familiar with his "community reputation."

U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151]; United States v. Third National Bank in Nashville, *supra* [390 U.S. 171, 88 S.Ct. 882, 883, 19 L.Ed.2d 1015 (1968)]." And then, after analysis of the commercial banking "product market" and the "relevant geographic market" the Court held that the Phillipsburg-Easton geographic "market" as related to commercial banking activity was a significant section of the country for the application of Section 7 of the Clayton Act.

 In the light of *Phillipsburg* and the admission by stipulation that the proposed merger would result in anti-competitive effects in the relevant geographic market area, the "Bennington Area," it would appear that this court must hold that, in the circumstances here, the "Bennington Area" constitutes a section of the country pursuant to Section 7 of the Clayton Act and one comprehended within the Bank Merger Act of 1966. We think that this conclusion is required by the Supreme Court's language in *Phillipsburg*, for if we held otherwise:

" . . . the effect would likely be to deny customers of small banks—and thus residents of many small towns— the antitrust protection to which they are no less entitled than customers of large city banks. Indeed, the need for that protection may be greater in the small town since, as we have already stated, commercial banks offering full-service banking in one institution may be peculiarly significant to the economy of communities whose population is too small to support a large array of differentiated savings and credit businesses." *Phillipsburg, supra,* at 361–362, 90 S.Ct. at 2042.

Accordingly, it is ordered that

The motions of defendants and of the intervenor for the entry of summary judgment in their favor are denied and the motion of the plaintiff United States for the entry of summary judgment in its favor is granted.